1  Kirk C. Chamberlin (SBN 132946)
   kchamberlin@ckbllp.com
2  Yvonne M. Schulte (SBN 237868)
   yschulte@ckbllp.com
3  Heather A. Hickman (SBN 266689)
   hhickman@ckbllp.com
4  CHAMBERLIN KEASTER & BROCKMAN LLP
   16000 Ventura Boulevard, Suite 700
5  Encino, California 91436-2758
   Telephone:  (818) 385-1256
6  Facsimile:  (818) 385-1802

7  Attorneys for Plaintiff
   CHUBB CUSTOM INSURANCE COMPANY

8
                    UNITED STATES DISTRICT COURT
9
                   CENTRAL DISTRICT OF CALIFORNIA
10
                   **CV13- 01158** ᴾᴿˢᵂᴸ (AJWᴾx)
11
   CHUBB CUSTOM INSURANCE            CASE NO. _____
12 COMPANY,
                                     COMPLAINT
13            Plaintiff,
                                     1.  **CERCLA, 42 U.S.C. § 9607(a)**
14      v.                               **(Response Costs)**
                                     2.  **CERCLA, 42 U.S.C. § 9613(f)**
15 UNITED STATES OF AMERICA,            **(Contribution)**

16            Defendant.

17

18        COMES NOW, Plaintiff Chubb Custom Insurance Company ("Chubb" or

19 "Plaintiff"), by its attorneys, Chamberlin Keaster & Brockman LLP, for its Complaint

20 against Defendant United States of America ("United States" or "Defendant"), and

21 hereby alleges upon knowledge as to itself and upon information and belief as to

22 others, as follows:

23                      **NATURE OF THE ACTION**

24        1.    This is a civil action for cost recovery and contribution under sections

25 107(a) and 113(f) of the Comprehensive Environmental Response, Compensation and

26 Liability Act of 1980 ("CERCLA"), as amended, 42 U.S.C. §§ 9601-9675.

27        2.    On or about May 25, 2011, Chubb paid $ 8.55 Million in necessary costs

28 of response incurred in a manner consistent with the National Contingency Plan

1   ("NCP"), 40 C.F.R. Part 300 et seq., caused by the release or threatened release of

2   hazardous substances on or in the vicinity of a site located at 22116 West Soledad

3   Canyon Road, in Santa Clarita, California (the "Site").

4          3.      On or about January 9, 2012, Chubb paid an additional $6.5 Million in

5   necessary costs of response incurred in a manner consistent with the NCP, 40 C.F.R.

6   Part 300 et seq., caused by the release or threatened release of hazardous substances

7   on or in the vicinity of the Site.

8          4.      By this action, Chubb seeks to recover from the Defendant the necessary

9   costs of response that Chubb has incurred consistent with the NCP, 40 C.F.R. Part 300

10   et seq., caused by the release or threatened release of hazardous substances on or in

11   the vicinity of the Site.

12          5.      For purposes of this action, the phrase, "Response Costs" include all

13   necessary costs of response that Chubb has incurred consistent with the NCP, caused

14   by the release or threatened release of hazardous substances including without

15   limitation, perchlorate, copper, chromium, barium, lead, zinc, lead azide, red

16   phosphorus, polyvinyl acetate, cyclotrimethylene trinitramine ("RDX"),

17   cyclotetramethylene tetranitramine ("HMX"), methyl ethyl ketone ("MEK"), hexane,

18   N-nitrosodimethylamine ("NDMA"), nitrate, semi-volatile organic compounds

19   ("SVOCs"), dioxin/furans, ordnance and explosive waste ("OE"), unexploded

20   ordnance ("UXO"), depleted uranium ("DU") and chlorinated solvents, including but

21   not limited to trichloroethylene ("TCE") and perchloroethylene ("PCE") on or in the

22   vicinity of the Site.

23          6.      Plaintiff and Whittaker Corporation ("Whittaker") have been required

24   (and Whittaker will continue to be required) to expend Response Costs at the Site

25   discussed herein.  Plaintiff is entitled to recover from the Defendant with respect to

26   those Response Costs that relate to the period during which the Defendant owned

27   and/or exercised substantial control over operations at the Site, including but not

28   limited to, the manner in which hazardous substances were disposed.  Through this

2

COMPLAINT

1   suit, Plaintiff seeks to recover these Response Costs from the Defendant.

## JURISDICTION AND VENUE

3   7.   This Court has exclusive jurisdiction over this action pursuant to section 113(b) of CERCLA, 42 U.S.C. § 9613(b).

5   8.   Venue is proper in this Court pursuant to section 133(b) of CERCLA, 42 U.S.C. § 9613(b), because Defendant may be found, and the releases or threatened releases of hazardous substances alleged herein occurred, in this judicial district.

## PARTIES

9   9.   Chubb is a corporation duly formed under the laws of the State of Delaware, with its principle place of business in the State of New Jersey.

11   10.   Defendant is the United States of America, which acting through various departments, agencies and instrumentalities, operated or significantly controlled the Site or portions of the Site identified herein, and/or by contract, agreement or otherwise, arranged for or exercised significant control over the disposal or treatment of hazardous substances at the Site.  Defendant may be found, conducts affairs and renders services within the Central District of California.

## FACTUAL BACKGROUND

### A.   The Site and its History

19   11.   The Site covers approximately 996 acres of land in the City of Santa Clarita, Los Angeles County, California.

21   12.   In 1942, Bermite Powder Company ("Bermite"), a defense contractor, purchased the Site from E.P. Halliburton, Inc. ("Halliburton").

23   13.   Bermite owned the Site from 1942-1967, manufacturing and testing military munitions under contracts with Defendant.

25   14.   Bermite, and later Whittaker, manufactured and tested certain munitions for Defendant including flares, ammunitions, explosives, rocket motors, signal cartridges and other illumination devices and weaponry to support military efforts during World War II, the Korean War and the Vietnam War, and to prepare for

CHAMBERLIN KEASTER
& BROCKMAN LLP

1   subsequent military conflicts.

2       15.     During Bermite's ownership of the Site, a substantial percentage of
3   Bermite's manufacturing operations went to satisfy contracts with and orders from
4   Defendant.

5       16.     Whittaker purchased the stock, assets and liabilities of Bermite in 1967,
6   and owned and operated the Site until 1998.

7       17.     Whittaker novated all of Bermite's government contracts after it acquired
8   the Site in 1967.

9       18.     Approximately 95 to 98 percent of Whittaker's manufacturing capacity
10  went to satisfy its contracts with and orders from the Defendant.

11      19.     Whittaker continued to manufacture, among other things, rocket motors,
12  igniters, flares, tracers, detonators, ammunition rounds and practice bombs for
13  Defendant from 1967 through 1987.

14      20.     Whittaker ceased operations in 1987, but continued to own the Site until
15  1998 when it was sold to Santa Clarita LLC ("SCLLC") and Bermite Recovery LLC
16  ("BRLLC") in late 1998.

17      21.     The manufacturing and testing processes performed according to
18  Defendant's express requirements and specifications involved the use, storage and
19  disposal of various hazardous substances, as defined in CERCLA, which remain in the
20  soil and groundwater beneath the Site, and in the groundwater adjacent to and
21  allegedly emanating from the Site.

22      22.     During its ownership period, Halliburton's activities were primarily in
23  the northern portion of the Site.

24      23.     During its ownership period, at the direction of or with knowledge and
25  consent of Defendant, Bermite expanded the plan outside the northern portion of the
26  Site, and began manufacturing, testing and waste-burning operations in the central
27  portion of the Site ("Parcel 2").

28  ///

4

CHAMBERLIN KEASTER
& BROCKMAN LLP

24.     During its ownership period, Whittaker, like Bermite, used Parcel 2 for manufacturing, testing and waste-burning operations.

25.     Throughout both Bermite's and Whittaker's operation of the Site (1942-1987), Defendant owned, kept, operated and maintained a large amount of equipment at the Site for use in the manufacture of explosives, ordnance and other products for Defendant. Without Defendant's specialized equipment, Bermite and Whittaker could not manufacture some of the munitions ordered by Defendant.

**B.     Defendant's Control of the Site**

26.     Prior to the entry by the United States into World War II, and then during and after World War II, Congress enacted broad statues, which Defendant implemented through the issuance of regulations and executive orders, designed to mobilize the United States government and economy in the interests of national defense, to build and operate plants and facilities for the manufacture of war material, and to buy or otherwise control facilities, materials, equipment and supplies deemed by the Defendant to be strategic and vital to the war effort and national defense. Collectively, these statues, regulations and executive orders provided Defendant with extraordinary powers to control the economy and individual plants and facilities in the interests of national defense and to compel the production of products vital to the war effort.

27.     At various times before, during and after World War II, Defendant owned, operated, managed, directed, or controlled the Site or portions of the Site.

28.     Through its control of the wartime economy in general and through its contracts with Bermite and Whittaker in particular, Defendant exercised pervasive control over operations at the Site and was actively involved in Site activities, including but not limited to, the manner in which chlorinated solvents, including but not limited to, TCE and PCE, were purchased, supplied, used and stored at the Site, and the manner in which solvent-based and solvent containing wastes were disposed. ///

CHAMBERLIN KEASTER
& BROCKMAN LLP

29.   At various times, Defendant determined what products were manufactured at the Site.

30.   At various times, Defendant specified how such products would be manufactured and what hazardous substances would be used during such manufacturing processes.

31.   At various times, Defendant controlled the price and purchase requirements of the products.

32.   At various times, Defendant supplied manufacturing equipment for use at the Site.

33.   At various times, Defendant acted to ensure an adequate labor force at the Site.

34.   At various times, Defendant participated in management decisions at the Site.

35.   At various times, Defendant controlled both the production and waste handling processes at the Site through regulations, contractual requirements and on-Site inspections.

36.   At various times, Defendant attended plant meetings at the Site to address production and waste issues.

37.   Through one of its agencies, first the Department of the Navy, and subsequently the Defense Contractors Administrative Services ("DCAS"), Defendant maintained an office at the Site, as well as local offices in Los Angeles County.

38.   Through the Department of the Navy and DCAS, Defendant exercised control over virtually all aspects of the government projects undertaken by Bermite and Whittaker at the Site.

39.   On a regular basis, four (4) to six (6), and sometimes as many as fourteen (14), DCAS inspectors worked on-Site at the DCAS office. Prior to any large contracts being awarded, DCAS personnel, including safety and quality assurance personnel, would ensure that either Bermite or Whittaker had the necessary equipment

1   and materials to perform under the Defendant's contracts.

2   40.   With respect to certain contracts, if Bermite or Whittaker did not possess
3   the equipment necessary to perform under Defendant's contracts, Defendants would
4   furnish government-owned equipment to Bermite or Whittaker necessary to perform
5   under such contracts.

6   41.   With respect to certain contracts, if Bermite or Whittaker did not possess
7   or could not obtain the materials necessary to perform under Defendant's contracts,
8   Defendants would furnish government-owned materials to Bermite or Whittaker
9   necessary to perform under such contracts.

10   42.   DCAS performed quality assurance and safety inspections at the Site
11   pertaining to products being manufactured for Defendant.  DCAS was also concerned
12   with the manufacturing, handling and testing process, which included, among other
13   things, implementation and approval of both manufacturing and waste disposal
14   procedures.

15   43.   In accordance with Defendant's written directives, DCAS inspectors
16   specifically instructed Whittaker personnel on, and demanded compliance with, the
17   prescribed use, storage and waste disposal methods and procedures.

18   44.   DCAS inspectors had the power to shut down operations at the Site if
19   inspectors believed Whittaker's operations and/or disposal practices posed a safety
20   concern or were not in compliance with Defendant's written directives.

21   45.   DCAS sent out inspectors to monitor the use and maintenance of
22   government-owned equipment being kept, operated and maintained at the Site.

23   **C.   Defendant's Contracts with Bermite and Whittaker**

24   46.   Each of the Bermite and Whittaker contracts with Defendant or
25   Defendant's prime contractors contained detailed specifications on how to
26   manufacture the product, including the raw material to be used, with specific
27   references made to various military safety guidance manuals, directives and
28   demilitarization clauses, which mandated procedure and protocols on how to handle

7

CHAMBERLIN KEASTER
& BROCKMAN LLP

1    and ultimately dispose of toxic and hazardous substances.

2         47.    Defendant's Safety Regulations from the early 1980s provide that

3    "[w]hen hazardous materials are not disposed of in-house at the contractor's facilities,

4    the contractor/subcontractor shall request disposition instructions or obtain approval

5    of a proposed procedure from the contracting officer."

6         48.    The Demilitarization Clause contained in Defendant's contracts from the

7    same time period provided that all government products, and their byproducts, must

8    be disposed of or destroyed so as to prevent the possibility of reconditioning such

9    property to make it saleable as implements of war, and further provided that all

10   ammunition, military explosives and missile propellants used in the manufacture of a

11   government product must be destroyed by Defendant's prescribed methods.

12        **D.    "Burn Valley"**

13        49.    In written manuals, directives, correspondence and orally, Defendant

14   required that excess or unusable ignitable wastes be burned at the Site as the preferred

15   method of disposal.

16        50.    Ignitable wastes were disposed of at the Site in designated open-air burn

17   areas, which were located on a portion of the Site known as "Burn Valley."

18        51.    Propellant and other ignitable wastes were dumped into two pits and

19   ignited remotely.

20        52.    Hazardous substances present in the ignitable wastes reached the soil and

21   groundwater in the Burn Valley area through a combination of events including

22   particle emission during the burning phase (which often caused flames to shoot

23   hundreds of feet into the air), and the continual washing down of the burn area with

24   large quantities of water, all pursuant to Defendant's directives.

25        53.    The Site's Burn Valley area had a limited capacity and limited

26   operational period (controlled by South Coast Air Quality Management District

27   permit), causing Whittaker to have excess ignitable wastes that it had to stockpile on

28   Site.

54.    Defendant became aware at some time earlier than 1981 that the burning of ignitable wastes was leading to groundwater contamination.  Nevertheless, Defendant continued to direct its contractors to burn ignitable wastes because Defendant viewed burning as the most cost effective means for dealing with such wastes.

55.    In 1993, the California Department of Toxic Substance Control ("DTSC") conducted a sampling investigation in selected portions of the Site, including the Burn Valley.  Soil samples taken from trenches excavated in the Burn Valley revealed elevated concentrations of PCE, lead, copper, chromium and barium.

56.    Defendant's prescribed disposal of ignitable wastes by open-air burning has left behind soil and groundwater contamination.

**E.    Metal Degreasing and "Hog-Out" Processes**

57.    Defendant's contracts specified that Whittaker and Bermite remove grease residue from certain metal-based products, including rocket motors used in the production of JATO, Sidewinder and Chaparral rockets at various points during the manufacturing process.

58.    Defendant's contracts specified that Whittaker and Bermite personnel remove grease residue from certain metal-based products using a vapor degreasing method, in which degreasing solvents, including but not limited to, TCE, were heated in large tanks.

59.    A similar degreasing operation prescribed by Defendant was conducted at the Site in connection with retrofitting non-complying motors used in the Sidewinder and Chaparral rockets that Bermite and Whittaker made for Defendant.

60.    For the Sidewinder and Chaparral rocket motors, the propellant was cast directly into the rocket motor tubes as slurry.

61.    Often, the propellant would not cure properly, would not pass DCAS inspection or would go flat.

///

9

CHAMBERLIN KEASTER
& BROCKMAN LLP

62.    In each instance, Defendant required that the propellant be removed from the rocket tubes with a large boring tool.  This procedure became known as "hog-out."

63.    According to Defendant's directives, specifications and requirements, and under the supervision of DCAS personnel, after the propellant was "hogged-out," Bermite and Whittaker personnel were required to remove rubber residue from the motors using solvents.

64.    The solvents used to remove rubber residue from the rocket motors contained hazardous substances, including, but not limited to TCE and PCE.

65.    According to Defendant's directives, specifications and requirements, and under supervision of DCAS personnel, after the rubber residue was stripped out of the motors, Bermite and Whittaker personnel were required to degrease the rocket motors using degreasing solvents, including but not limited to TCE.

66.    Upon information and belief, Bermite and Whittaker, under the supervision and direction of DCAS, dug a pit in the vicinity of the rocket motor manufacturing facilities, and placed a rectangular tank in the pit that was used to hold and heat the TCE used in the degreasing activities mandated by Defendants.

67.    The hog-out, degreasing and rubber stripping activities have left behind soil and groundwater contamination.

**F.    Chubb's Coverage**

68.    Whittaker purchased a Remediation Cost Cap Environmental Site Liability Policy (the "Chubb Policy"), no. 3725-38-79, from Chubb, with effective dates of December 3, 2001 to December 30, 2008.

69.    The Chubb Policy provides certain liability coverage, subject to policy limits and a deductible, related to bodily injury, property damage or remediation costs (as defined in the Policy) associated with third-party claims made and reported during the policy period and pollution incidents discovered and reported during the policy period ("Coverage A").

///

10

CHAMBERLIN KEASTER & BROCKMAN LLP

70.    The Chubb Policy also provides certain remedial cost cap cleanup coverage, subject to certain self-insured retentions and policy limits, related to Cleanup Costs associated with the remedial action (as defined in the Policy) ("Coverage E").

**G.    Prior Enforcement Against Whittaker**

71.    The DTSC issued a Consent Order against Whittaker dated November 21, 1994 (the "Consent Order").

72.    In December 1998, Whittaker sold the Site to SCLLC and BRLLC. Upon purchasing the Site, SCLLC purchased a property transfer liability insurance policy from Steadfast Insurance Company ("Steadfast") (the "PLC Policy"). BRLLC and Remediation Financial, Inc. (the "RFI Parties") and Whittaker were additional named insureds under the PLC Policy.

73.    The RFI Parties became subject to the Consent Order when they acquired the Site in 1998, and reconfirmed that obligation when SCLLC entered into an "Enforceable Agreement" with the DTSC on or about February 13, 2001.

74.    Based on the Consent Order and Enforceable Agreement, the RFI Parties engaged in cleanup and remediation-related efforts at the Site throughout the period of 1999-2001.

75.    Specifically, the soil and groundwater were and currently are the target of remedial efforts approved by and under the oversight of the DTSC, designed not only to eliminate or control the sources at, and otherwise remediate, the Site, but also to address the alleged historical and continuous migration of contaminants from the Site to the public drinking water supplies adjacent to the Site.

76.    In or around January 2002, the California Attorney General notified SCLLC that it was in default of its obligations under the Enforceable Agreement. The RFI Parties filed for bankruptcy in the United Stated Bankruptcy Court for the District of Arizona in 2004, and those bankruptcy proceedings are being jointly administered in the matter *In re RFI Realty, Inc., et al.*, Case No. 2-04-bk-10486-CGC.

11

CHAMBERLIN KEASTER
& BROCKMAN LLP

77.   In November 2002, the DTSC issued an Imminent and Substantial Endangerment Determination and Order and Remedial Action Order ("Endangerment Order") against Whittaker, which requires Whittaker to investigate and remediate the Site.  The Endangerment Order also provides that Whittaker remains subject to the Consent Order and the Endangerment Order.

78.   Since 2002, Whittaker has been remediating the Site under the oversight of the DTSC in accordance with the Consent Order and the Endangerment Order.

79.   In 2001, Steadfast filed coverage litigation in California state court against its insureds to determine, among other things, Steadfast's obligations under the PLC Policy for costs incurred by Whittaker and the RFI Parties to: (1) defend the CLWA Case (defined below); (2) satisfy any liability to plaintiffs in the CLWA Case; and (3) remediate contamination at or near the Bermite Property, including the groundwater.  In August 2003, Steadfast added American International Surplus Lines Insurance Company ("AISLIC") and others as defendants to the coverage lawsuit and alleged, *inter alia*, that AISLIC was obligated to pay or reimburse Steadfast for certain amounts Steadfast may be required to pay.

80.   The coverage litigation was removed and transferred to the United States Bankruptcy Court for the District of Arizona and was later settled as part of a "Coverage and Claims Settlement Agreement," as and between RFI Parties, Whittaker, Steadfast and AISLIC.

81.   On November 15, 2005, AISLIC, Steadfast, Whittaker, the RFI Parties and other parties entered into the Coverage and Claims Settlement Agreement ("CCSA").  The Bankruptcy Court approved the CCSA, with some modification, in its Ordering Approving Coverage and Claims Settlement Agreement dated December 22, 2005.

82.   Under the CCSA, escrow accounts were established to fund covered cleanup costs by Whittaker or an approved Buyer of the Site to investigate and remediate contamination at or near the Site, including the groundwater, and to provide

CHAMBERLIN KEASTER
& BROCKMAN LLP

1   for certain funding of any settlement of, or judgment in, the CLWA Case.

2       83.    In 2000, both Whittaker and the RFI Parties were sued in the United

3 States District Court for the Central District of California by the Castaic Lake Water

4 Agency, Santa Clarita Water Company, Newhall County Water District and Valencia

5 Water Company in an action titled *Castaic Lake Water Agency, et al. v. Whittaker*

6 *Corporation, et al.*, Case No. CV-00-12613 AHM (the "CLWA Case").

7       84.    The CLWA Case asserted claims under 42 U.S.C. § 9607(a), alleging

8 among other things that: (1) groundwater in the vicinity of the Site is contaminated by

9 hazardous substances released at the Site; (2) that groundwater contamination

10 emanating from the Site has made its way to the plaintiffs' drinking water supply

11 wells; and (3) Whittaker and RFI Parties caused the groundwater contamination by

12 releasing hazardous substances at the Site. The plaintiffs in the CLWA Case sought

13 recovery of their alleged Response Costs and other damages, as well as injunctive and

14 declaratory relief against Whittaker and the RFI Parties.

15       85.    The CLWA Plaintiffs, Whittaker, AISLIC and the RFI Parties settled the

16 CLWA Case on April 6, 2007; the United States Bankruptcy Court for the District of

17 Arizona approved the settlement ("CLWA Settlement") on June 15, 2007; and the

18 United States District Court for the Central District of California approved the CLWA

19 Settlement on July 13, 2007, which was the Effective Date of the CLWA Settlement.

20 The CLWA Case has now been dismissed in accordance with the CLWA Settlement.

21       86.    Under the CCSA, Whittaker, AISLIC and other insurers agreed to pay

22 out certain sums under policies covering certain Site liabilities, including the AISLIC

23 Policy, to fund amounts into escrows and to provide certain direct funding for

24 response and remedial actions associated with the Site and settlement (including

25 funding of groundwater treatment) of the claims of the CLWA Plaintiffs associated

26 with environmental contamination of the Site.

27       87.    Under the terms of the CCSA, Whittaker was required to fund a

28 maximum of $8,550,000 through the Whittaker Escrow. The funds deposited into the

1   Whittaker Escrow were used to pay costs incurred to investigate and remediate
2   contamination related to the Site.

3          88.    The parties to the CLWA Settlement and the CCSA acknowledged and
4   agreed that the payments and expenditures required under the CLWA Settlement are
5   reasonable and necessary for addressing groundwater contamination emanating from
6   the Site and are consistent with the NCP, and are deemed "Response Costs" as that
7   term is used and contemplated in CERCLA.

8          89.    In March of 2008, AISLIC brought suit against Chubb for contribution
9   and declaratory relief in connection with the remediation costs paid under the CCSA
10  (the "AISLIC Action").  Chubb then filed a separate action for contribution and
11  declaratory relief as against AISLIC and Whittaker (the "Chubb Action").  In
12  response, Whittaker filed a cross-complaint in the Chubb action, alleging breach of
13  contract and seeking declaratory relief.  The AISLIC Action and the Chubb Action
14  were deemed related by the Court.

15         90.    On or about May 25, 2011, Whittaker and Chubb entered into a
16  Settlement Agreement for their claims in the Chubb Action (the "Whittaker
17  Settlement Agreement") in which Chubb paid $8.55 Million in remediation costs, plus
18  interest.

19         91.    Chubb seeks to recover the $8.55 Million in remediation costs, plus
20  interest, paid on behalf of Whittaker for clean-up costs incurred to investigate and
21  remediate contamination related to the Site.

22         92.    By entering into the Whittaker Settlement Agreement, Chubb reserved
23  any and all of its rights under the Chubb Policy and applicable law and equity to assert
24  rights of subrogation, contribution, equitable subrogation, or indemnification for the
25  amounts paid toward satisfaction of Whittaker's obligations related to the Site from
26  any person not a party to said settlement agreements.

27         93.    As Whittaker's insurer, and pursuant to Section IV.18 of the Chubb
28  Policy and the Whittaker Settlement Agreement, Chubb stands as subrogee to any

claim to which Whittaker is or may be entitled that seeks recovery of costs and/or contribution from the Defendant based on the latter's responsibility for owning and/or operating the Site and/or for arranging for the disposal or treatment of hazardous substances at the Site.

94.     On or about January 6, 2012, AISLIC and Chubb entered into a Settlement Agreement for their claims in the AISLIC Action and Chubb Action (the "AISLIC Settlement Agreement") in which Chubb paid $6.5 Million in remediation costs, plus interest.

95.     Chubb seeks to recover the $6.5 Million in remediation costs, plus interest, paid to AISLIC for indemnification of Whittaker's clean-up costs incurred to investigate and remediate contamination related to the Site.

96.     By entering into the AISLIC Settlement Agreement, Chubb reserved any and all of its rights under the Chubb Policy and applicable law and equity to assert rights of subrogation, contribution, equitable subrogation, or indemnification for the amounts paid toward satisfaction of Whittaker's obligations related to the Site from any person not a party to said settlement agreement.

97.     The claims asserted by Chubb in this action are based on the $8.55 Million payment made on behalf of Whittaker and the Whittaker Settlement Agreement to remediate hazardous substances, as well as the $6.5 Million payment made to AISLIC to indemnify it for clean-up costs incurred to investigate and remediate contamination related to the Site.

98.     The $15.05 Million as set forth in Paragraph 97 has been spent on, or is dedicated to, funding actions necessary to prevent damage to the public health or welfare, including but not limited to: (a) costs of removal and remediation of hazardous substances from the Site; (b) actions necessary to monitor, assess and evaluate a release or threat of release; (c) the provision of alternative water supplies; (d) the planning and implementation of a response action; (e) investigation, monitoring and testing of a contaminated site; and (f) the cost of planning and

1  implementing response actions.

2      99.    Remedial actions associated with the Site and the groundwater

3  contaminated by the Site are being accomplished in a manner which: (1) is protective

4  of human health and the environment; (2) utilizes permanent solutions and alternative

5  treatment technologies—to the extent practical; and (3) is cost effective.

6      100.   As such, the DTSC is reviewing and must approve all Remedial Action

7  Plans ("RAP") for the Site.  There are a total of seven Operable Units (OUs) on the

8  Site, including OU-7 which is applicable to groundwater.  The RAP for OU-1 has

9  been approved by the DTSC.  A Draft RAP for Operable Units 2 through 6 that is

10 focused on soil remediation was submitted to the DTSC in 2009.  Whittaker has also

11 completed a Draft OU 7 Feasibility Study to identify and select treatment technologies

12 for both on-site and off-site groundwater.  The DTSC approved the RAP for

13 contaminated soils in Operable Units 2 through 6 on December 6, 2010.

14      101.   Section 107(a)(4)(B) of CERCLA, 42 U.S.C. § 9607(a)(4)(B), provides

15 that any "covered person…shall be liable for…any other necessary costs of response

16 incurred by any other person consistent with the national contingency plan."

17      102.   Section 113(f)(1) provides that "[a]ny person may seek contribution from

18 any other person who is liable or potentially liable under" Section 107(a) of CERCLA

19 "during or following any civil action under" section 106 or section 107(a) of

20 CERCLA, 42 U.S.C. §§ 9606 and 9607(a).

21      103.   Defendant is a "person" within the meaning of section 101(21) of

22 CERCLA, 42 U.S.C. §§ 9601(21).

23      104.   The Site is a "facility" within the meaning of section 101(9) of CERCLA,

24 42 U.S.C. § 9601(9).

25      105.   Releases or threatened releases of hazardous substances into the

26 environment have occurred at the Site within the meaning of section 101(22) of

27 CERCLA, 42 U.S.C. § 9602(22).

28 ///

16

CHAMBERLIN KEASTER
& BROCKMAN LLP

106.   Chubb has undertaken, and continues to undertake, response actions at the Site in response to releases or threatened releases of hazardous substances, and has incurred and will incur necessary costs of response consistent with the NCP.

107.   The CLWA Case is a civil action commenced against Whittaker and the RFI Parties under, among other laws, 42 U.S.C. § 9607(a).

108.   The DTSC Orders to Whittaker and the Enforceable Agreement with RFI Parties qualify as a "civil action" under, among other laws, 42 U.S.C. § 9607(a).

### FIRST CLAIM FOR RELIEF
### (COST RECOVERY AND CONTRIBUTION BASED ON DEFENDANT'S OWNER LIABILITY UNDER CERCLA)

109.   Plaintiff incorporates and re-alleges paragraphs 1 through 108 above, as though fully set forth herein.

110.   Plaintiff has incurred costs in an amount exceeding $15 million, which constitute necessary costs of response, i.e., Response Costs, incurred in a manner consistent with the NCP under 42 U.S.C. § 9607(a)(4)(B) to remediate perchlorate and other hazardous substances.

111.   At various times during and after World War II, and at various times up to and until Whittaker ceased operations at the Site in 1987, hazardous substances were disposed of at the Site at the time Defendant owned parts or all of the Site or facilities at the Site, including equipment.  As such, Defendant is a person who owned the Site or facilities at the Site at the time of disposal of hazardous substances at the Site, and therefore is a person who owned the Site within the meaning of Section 107(a)(2) or CERCLA, 42 U.S.C. § 9607(a)(2).

112.   Pursuant to Sections 107(a)(4)(B) and 113(f)(1) of CERCLA, 42 U.S.C. §§ 9607(a)(4)(B) and 9613(f)(1), by this action, Plaintiff is entitled to cost recovery and contribution from Defendant in connection with the Site, and all Response Costs incurred by Plaintiff or for which Plaintiff is deemed liable should be allocated

CHAMBERLIN KEASTER
& BROCKMAN LLP

1  between Defendant and Plaintiff using such equitable factors as the Court determines
2  are appropriate.

3      113.   Plaintiff is entitled to interest on the amount recovered on this claim
4  pursuant to 42 U.S.C. §9607(a)(2).

5                    **SECOND CLAIM FOR RELIEF**
6   **(COST RECOVERY AND CONTRIBUTION BASED ON DEFENDANT'S**
7         **OPERATOR LIABILITY UNDER CERCLA)**

8      114.   Plaintiff incorporates and re-alleges paragraphs 1 through 113 above, as
9  though fully set forth herein.

10     115.   Plaintiff has incurred costs in an amount exceeding $15 million, which
11 constitute necessary costs of response, i.e., Response Costs, incurred in a manner
12 consistent with the NCP under 42 U.S.C. § 9607(a)(4)(B) to remediate perchlorate and
13 other hazardous substances.

14     116.   At various times during and after World War II, and at various times up
15 to and until Whittaker ceased operation at the Site in 1987, hazardous substances were
16 disposed of at the Site at the time that Defendant managed, directed, or otherwise
17 controlled operations at the Site, including operations specifically related to the
18 acquisition, storage, use and disposal (including leakage and burning) of hazardous
19 substances.  As such, Defendant is a person who, at the time of disposal of hazardous
20 substances, operated the Site, and therefore is an operator of the Site within the
21 meaning of section 107(a)(2) of CERCLA, 42 U.S.C. § 9607(a)(2).

22     117.   Pursuant to sections 107(a)(4)(B) and 113(f)(1) of CERCLA, 42 U.S.C.
23 §§ 9607(a)(4)(B) and 9613(f)(1), by this action, Plaintiff is entitled to cost recovery
24 and contribution from Defendant in connection with the Site, and Defendant is liable
25 for contribution for the Response Costs based on such equitable factors as the Court
26 determines are appropriate.

27 ///
28

CHAMBERLIN KEASTER
& BROCKMAN LLP

118.   Plaintiff is entitled to interest on the amount recovered in this claim pursuant to 42 U.S.C. §9607(a)(2).

## THIRD CLAIM FOR RELIEF
## (COST RECOVERY AND CONTRIBUTION BASED ON DEFENDANT'S ARRANGER LIABILITY UNDER CERCLA)

119.   Plaintiff incorporates and re-alleges paragraphs 1 through 118 above, as though fully set forth herein.

120.   Defendant is liable or potentially liable for the Response Costs under 42 U.S.C. § 9607(a)(3) as a person who by contract, agreement or otherwise arranged for the disposal or treatment of hazardous substances at the Site.

121.   Pursuant to sections 107(a)(4)(B) and 113(f)(1) of CERCLA, 42 U.S.C.§§ 9607(a)(4)(B) and 9613(f)(1), by this action, Plaintiff is entitled to cost recovery and contribution from Defendant in connection with the Site, and Defendant is liable for contribution for the Response Costs based on such equitable factors as the Court determines are appropriate.

122.   Plaintiff is entitled to interest on the amount recovered on this claim pursuant to U.S.C. § 9607(a)(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment in its favor and against Defendant, to the extent authorized by law, as follows:

1.     ON THE FIRST CLAIM FOR RELIEF, for recovery of all past Response Costs incurred at the Site consistent with the NCP, including pre-judgment interest as allowed by law;

2.     ON THE SECOND CLAIM FOR RELIEF, for recovery of all past Response Costs incurred at the Site consistent with the NCP, including pre-judgment interest as allowed by law;

///

CHAMBERLIN KEASTER
& BROCKMAN LLP

3.     ON THE THIRD CLAIM FOR RELIEF, for recovery of all past and Response Costs incurred at the Site consistent with the NCP, including pre-judgment interest as allowed by law;

4.     AS TO ALL CLAIMS FOR RELIEF, an allocation among Plaintiff and Defendant and any other persons found to be liable for all Response Costs incurred at or with respect to the Site pursuant to sections 107(a)(4)(B) and 113(f)(1) of CERCLA, 42 U.S.C. §§ 9607(a)(4)(B) and 9613(f)(1), and an Order requiring Defendant to pay such amounts to Plaintiff; and

5.     AS TO ALL CLAIMS FOR RELIEF, all costs and expenses incurred in this action, to the extent provided for by law, and such other and further relief as the Court may deem just and proper.


DATED: February 15, 2013

**CHAMBERLIN KEASTER & BROCKMAN LLP**

By: _____

Kirk C. Chamberlin
Yvonne M. Schulte
Heather A. Hickman
Attorneys for Plaintiff **CHUBB CUSTOM
INSURANCE COMPANY**

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Ronald S. W. Lew and the assigned discovery Magistrate Judge is Andrew J. Wistrich.

The case number on all documents filed with the Court should read as follows:

## CV13- 1158 RSWL (AJWx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| | | |
|---|---|---|
| [✓] **Western Division** 312 N. Spring St., Rm. G-8 Los Angeles, CA 90012 | [ ] **Southern Division** 411 West Fourth St., Rm. 1-053 Santa Ana, CA 92701-4516 | [ ] **Eastern Division** 3470 Twelfth St., Rm. 134 Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

Kirk C. Chamberlin (SBN 132946)
Yvonne M. Schulte (SBN 237868)
Heather A. Hickman (SBN 266689)
CHAMBERLIN KEASTER & BROCKMAN LLP
16000 Ventura Blvd. Ste. 700
Encino, CA 91436-2758; (818) 385-1256



### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHUBB CUSTOM INSURANCE COMPANY | CASE NUMBER |
| PLAINTIFF(S) | CV13-01158 PSM (AJWx) |
| v. | |
| UNITED STATES OF AMERICA | SUMMONS |
| DEFENDANT(S). | |

TO:   DEFENDANT(S):

    A lawsuit has been filed against you.

    Within __60__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.   The answer or motion must be served on the plaintiff's attorney, _KIRK C. CHAMBERLIN_____, whose address is _16000 VENTURA BLVD., STE. 700, ENCINO, CA 91436-2758_____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

FEB 1 5 2013

Clerk, U.S. District Court

**JULIE PRADO**

Dated: _____

By: _____

Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*


COPY

### UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
CHUBB CUSTOM INSURANCE COMPANY

**DEFENDANTS**
UNITED STATES OF AMERICA

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)
CHAMBERLIN KEASTER & BROCKMAN LLP
16000 VENTURA BLVD. STE. 700
ENCINO, CA 91436-2758; (818) 385-1256

Attorneys (If Known)

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☐ 3 Federal Question (U.S. Government Not a Party)

☑ 2 U.S. Government Defendant  ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☑ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT:  JURY DEMAND:** ☐ Yes ☑ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☐ Yes ☑ No     ☑ MONEY DEMANDED IN COMPLAINT: $ 15,050,000+

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Civil action for cost recovery and contribution under sections 107(a) and 113(f) of CERCLA, 42 U.S.C. Sects. 9601, et seq.

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | ☐ 530 General | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 535 Death Penalty | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE / PENALTY | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury- Med Malpractice | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury- Product Liability | ☐ 443 Housing/Acco- mmodations | ☐ 630 Liquor Laws | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | IMMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 650 Airline Regs | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 660 Occupational Safety /Health | ☐ 863 DIWC/DIWW (405(g)) |
| ☑ 893 Environmental Matters | REAL PROPERTY | ☐ 463 Habeas Corpus- Alien Detainee | ☐ 440 Other Civil Rights | ☐ 690 Other | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 465 Other Immigration Actions | | | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi- nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 240 Torts to Land | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | |
| | ☐ 290 All Other Real Property | | | | |

# CV13-01158

**FOR OFFICE USE ONLY:**  Case Number: 11-CV-05564 GW (MRWx)

### AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

CV-71 (05/08)                      CIVIL COVER SHEET                      Page 1 of 2

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☐ No ☑Yes
If yes, list case number(s): 11-CV-05564 GW (MRWx)

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑Yes
If yes, list case number(s): American Int'l. Specialty Lines Ins. Co. v. U.S. (09-CV-01734 GW (RZx))

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)   ☑ A.   Arise from the same or closely related transactions, happenings, or events; or
                              ☑ B.   Call for determination of the same or substantially related or similar questions of law and fact; or
                              ☑ C.   For other reasons would entail substantial duplication of labor if heard by different judges; or
                              ☐ D.   Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  | STATE OF DELAWARE; STATE OF NEW JERSEY |

(b)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☑   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
|  |  |

(c)   List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES COUNTY |  |

* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties
Note: In land condemnation cases, use the location of the tract of land involved.

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date February 15, 2013

Notice to Counsel/Parties:   The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings
or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed
but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |